IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **NICOLE CLARKE-SMITH,** | § | |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:14-cv-2732** |
| | § | |
| **BUSINESS PARTNERS IN** | § | |
| **HEALTH CARE, LLC** | § | |
| | § | |
| **Defendant/Counter-Plaintiff.** | § | |

**<u>PLAINTIFF/COUNTER-DEFENDANT'S RESPONSE TO DEFENDANT/
COUNTER-PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Chris E. Howe
State Bar No. 10089400
Chris.howe@kellyhart.com
Ezra R. Kuenzi
State Bar No. 24078808
Ezra.kuenzi@kellyhart.com
**KELLY, HART & HALLMAN, P.C.**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 332-2500
(817) 878-9280 (fax)

**ATTORNEYS FOR
PLAINTIFF/COUNTER-DEFENDANT
NICOLE CLARKE-SMITH**

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................ 1

III. ARGUMENT AND AUTHORITIES .......................................................................... 7

    A.  SUMMARY JUDGMENT STANDARDS                      7

    B.  EVIDENCE OF RETALIATION IS OVERWHELMING       7

        1.  Clarke-Smith Engaged in Both Oppositional and Participatory Conduct ................... 9

        2.  Clarke-Smith Suffered Multiple Adverse Actions.................................................... 10

        3.  A Causal Connection Exists Between Clarke-Smith's Protected Conduct and The Adverse Actions........................................................................................................ 10

        4.  Evidence of Pretext Is Overwhelming ...................................................................... 11

    C.  THE OVERWHELMING EVIDENCE OF PRETEXT DESCRIBED ABOVE ALSO BARS SUMMARY JUDGMENT ON CLARKE-SMITH'S CLAIM SHE WAS FIRED BECAUSE OF HER RACE        13

    D.  BPIH IS NOT ENTITLED TO SUMMARY JUDGMENT ON CLARKE-SMITH'S FMLA CLAIMS        15

        1.  As An Integrated Or Joint Employer, BPIH Was An FMLA Covered Employer...... 15

        2.  Alternatively, BPIH Is A Joint Employer With Its Clients......................................... 19

        3.  BPIH Violated The FMLA By Terminating Clarke-Smith During An FMLA Leave................................................................................................................ 21

IV. CONCLUSION ........................................................................................................... 23

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Benussi v. UBS Fin. Serv., Inc.*
  2014 WL 558984 (S.D. N.Y. Feb. 13, 2014) ........................................................10

*Burlington Northern & Santa Fe RR. Co. v. White*,
  548 U.S. 53 (2006) ........................................................................................10, 13

*Crawford v. Metro. Gov. of Nashville*,
  555 U.S. 271 (2009) ...............................................................................................9

*Cuellar v. Keppel Amfels, LLC.*,
  731 F.3d 342 (5th Cir. 2013) ...............................................................................21

*Cuff v. Trans States Holdings, Inc.*,
  768 F.3d 605 (7th Cir. 2014) .........................................................................19, 20

*Demyanovich v. Cadon Plating & Coatings, LLC*,
  747 F.3d 419 (6th Cir. 2014) .........................................................................16, 18

*Dooling v. Bank of the West*,
  2013 WL 3776741 (E.D. Tex. July 17, 2013) ......................................................19

*Galindo v. Precision American Corp.*,
  754 F.2d 1212 (5th Cir. 1985) .............................................................................12

*Gee v. Principi*,
  289 F.3d 342 (5th Cir. 2002) ...........................................................................9, 12

*Ion v. Chevron USA, Inc.*,
  731 F.3d 379 (5th Cir. 2013) ...............................................................................22

*Jones v. Robinson Prop. Group, L.P.*,
  427 F.3d 987 (5th Cir. 2005) ...............................................................................11

*Laxton v. Gap, Inc.*,
  333 F.3d 572 (5th Cir. 2003) .....................................................................12, 13, 14

*Lopez v. Donahoe*,
  2015 WL 1311377 (S.D. Tex. March 23, 2015) .....................................................9

*Nero v. Indus. Molding Corp.*,
  167 F.3d 921 (5th Cir. 1999) ...............................................................................21

*Nowlin v. Resolution Trust Corp.*,
  33 F.3d 498 (5th Cir. 1994) .................................................................................10

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000)..............................................................................7, 13

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997).....................................................................................10

*Schubert v. Bethesda Health Group, Inc.*,
  319 F. Supp. 2d 963 (E.D. Mo. 2004).........................................................18

*Smith v. Xerox Corp.*,
  371 Fed. Appx. 514 (5th Cir. 2010)..............................................................10

*Strickland v. Water Works & Sewer Bd. Of City of Birmingham*,
  239 F.3d 1199 (11th Cir. 2001) ....................................................................21

*West v. Nabors Drilling Co.*,
  330 F.3d 379 (5th Cir. 2003) ........................................................................12

## FEDERAL STATUTES

29 C.F.R. § 825.104 (2015) ................................................................................15

29 C.F.R. § 825.104(c)(2)..................................................................15, 16, 19

29 C.F.R. § 825.106 ...........................................................................................16

29 C.F.R. § 825.106(a)................................................................................19, 20

29 C.F.R. § 825.216(a)(1) ..................................................................................21

29 C.F.R. § 825.305(b) .......................................................................................22

29 U.S.C. § 2612(a)(1).......................................................................................21

42 U.S.C. § 2000e-3(a) ........................................................................................9

42 U.S.C. § 2000e-3(a)(i) ..................................................................................10

COBRA....................................................................................................6, 8, 11, 12

FMLA .........................................................................5, 15, 16, 18, 19, 20, 21, 22, 23

## FEDERAL RULES

FED. R. CIV. P. 56(c) .............................................................................................7

## I. <u>INTRODUCTION</u>

Clarke-Smith, an African-American female, was discharged without prior warning from her job at BPIH on February 28, 2014.  At the time, she was on a FMLA-qualifying medical leave.  At the time Clarke-Smith left on leave, she had no idea her job was in jeopardy.  But in her last meeting with BPIH's CEO – who fired her – Clarke-Smith had in response to his coercive question, told him that she felt discriminated against at BPIH because of her race.

Besides terminating Clarke-Smith without warning for false reasons, BPIH took several other adverse actions against her, including suing her for over $1,000,000.  BPIH contends it sued Clarke-Smith for the same reasons it fired her.  However, that lawsuit's claims were bogus and utterly inconsistent with the reasons provided in BPIH's termination letter.  BPIH's reasons for firing and suing Clarke-Smith have continued to shift thereafter.

BPIH terminated Clarke-Smith because she was African-American, because she told BPIH's CEO that she had been discriminated against at BPIH, and because she was on FMLA-qualifying leave.  BPIH also sued Clarke-Smith to retaliate against her for her opposition to discrimination.  BPIH's summary judgment should be denied.

## II. <u>STATEMENT OF FACTS</u>

1.      Clarke-Smith was hired by BPIH in about October 2011.  (App. 1, ¶ 2).  Upon her hire at BPIH, Clarke-Smith was made the head of the human resources department.  She reported to BPIH CEO Josh Daniel.  (*Id.*).    BPIH functioned as the hub for human resources and other support functions for various companies in the health care field.  (App. 2, ¶ 4; App. 106).  Most of BPIH's health care clients were companies that were inter-related to BPIH in various ways.  (App. 5-6, ¶ 5).  For example, many of the clients officed in the same building as BPIH.  (App. 3, ¶ 6).  Several BPIH officers also served as officers of several of the client companies.  ( App. 5-6, ¶ 5; App. 107-109).  Employees often were transferred between BPIH and the other entities.

1

(App. 3, ¶ 6).  Four individuals – Andrew Hillman, Semyon Narosov, Michael Austin, and Josh Daniel – had significant control over BPIH and many of its client companies.  (App. 3, ¶ 5). Among other functions, BPIH acted as the human resources center for its clients.  (App. 2, ¶ 4). It not only created employment policies for the client companies, it also administered those policies, administered benefits, maintained personnel files, administered payroll functions, and regularly made and/or had significant input into decisions about the employment status of client's employees.  (*Id.*).  CEO Daniel often made discipline and firing decisions concerning employees of BPIH clients.  (*Id.*).  In February 2014, BPIH employed approximately fifty (50) employees.  (App. 3, ¶ 7).  Its client companies at that time employed hundreds of employees. (*Id.*).  Just counting the employees of BPIH and the clients that officed in the same building yield a total employee count at any one time from mid-2013 on of a least 100 employees in the Dallas/Fort Worth area.  (*Id.*).

2.     During her employment with BPIH, Clarke-Smith was never disciplined nor ever received any written warnings about her job performance.  (App. 4, ¶ 8).  In contrast, she received a written review authored by CEO Daniel in June 2013 that was largely effusive in praise of Clarke-Smith.   (*Id.*).   For example, Daniel stated that "Nicole's commitment, dedication, loyalty, and work ethic are unmatched by anyone in the company" (App. 9).  He wrote that she "consistently arrives early, stays late and will put in however much time is needed to get the job done".  (*Id.*).  Daniel continued: "Nicole's follow through is an area which couldn't possibly be improved – when assigned a task the task is completed 100% of the time".  (*Id.*). Daniel also wrote "Nicole has proven that she will take on whatever role the company needs her to in order to help BPIH and/or the client".  (*Id.*).

3.     From the date of this review until the day she was terminated in early 2014, Daniel often verbally praised Clarke-Smith's performance.  (App. 4, ¶ 8).  Before her firing, he never told her that her job was in jeopardy or that she was not meeting his expectations.  (*Id.*).

4.     BPIH typically followed a set practice when disciplining employees (who could be BPIH employees or client company employees).  (App. 4, ¶ 9; App. 110).  If an employee were performing poorly, a manager would typically consult with BPIH's human resources department.  (App. 4, ¶ 9).  Then the employee would be warned about the poor performance – typically in writing – and informed that he/she must improve or risk termination.  (*Id.*).  The same process would also typically apply when employees engaged in misconduct, even serious misconduct.  (*Id.*).  For example, CEO Daniel did not fire the chief operating officer of United Toxicology who had engaged in egregious misconduct, including screaming at subordinates and other extensive mistreatment of subordinates.  (App. 111-115; App. 19-20).  Rather, Daniel decided she should be given written discipline.  (*Id.*).

5.     BPIH typically did not contest unemployment benefit claims of white employees of BPIH or its clients, even where the employee engaged in serious misconduct.  (App. 4-5, ¶ 10).  BPIH also typically entered into severance agreements with terminated employees, even those who had engaged in serious misconduct.  (App. 5, ¶ 11).

6.     In about late December 2013, Clarke-Smith received a call from a employee of a BPIH client company – Champion Medical Center ("Champion") – who was very upset.  (App. 5, ¶ 12).  The employee – Ryan Lloyd – reported to Clarke-Smith that Champion's CEO had directed that Champion not hire African-Americans, had made numerous racist remarks about African-Americans, and had made numerous homophobic comments (Lloyd indicated he was gay).  (*Id.*).  Lloyd was very upset about the CEO's actions and comments and said he was

going to quit because of a hostile work environment.  (*Id.*).  In order to calm Lloyd down, and to forestall him from suing the client, Clarke-Smith commiserated with him, telling him she was an African-American woman and had reached a ceiling at work because of that.  (*Id.*).

7.      This report was not the first time the CEO's racism had been reported.  (App. 5, ¶ 12).  However, Champion's CEO was not discharged as a result of his misconduct.  Rather, he was allowed to resign and provided a severance agreement in which Champion agreed not to file charges or lawsuits against the CEO.  (*see* App. 21-27).  The CEO – who was white – was a friend of Andrew Hillman, one of the principals who controlled BPIH and many of its clients.  (App. 5-6, ¶ 13).  Clarke-Smith had routinely heard Hillman make racial comments in which he stereotyped BPIH African-American employees.  (*Id.*).

8.      In January 2014, several weeks after Clarke-Smith's call with Ryan Lloyd described above in Paragraph 6, CEO Daniel came unannounced into Clarke-Smith's office.  (App. 6, ¶ 14).  Saying that management had brought the issue to his attention, Daniel confronted Clarke-Smith and demanded to know whether Clarke-Smith had told anyone that she had reached a ceiling at BPIH because of her race.  (*Id.*).  Clarke-Smith confirmed to Daniel she had in fact told Lloyd that.  (*Id.*).  Daniel asked why she felt that way.  (*Id.*).  Clarke-Smith then forthrightly responded she felt that way because she worked for an organization that allowed Dr. Sylvest – a blatant racist – to run a company.  (*Id.*).  At the time, Clarke-Smith was the highest level African-American at BPIH or at any of its client companies.  When Clarke-Smith told Daniel why she believed she had reached a ceiling at BPIH due to her race, Daniel abruptly left Clarke-Smith's office.  (*Id.*).  This was the last face-to-face meeting Clarke-Smith ever had with CEO Daniel.  (*Id.*).

4

9.      Also in January 2014, Clarke-Smith began to suffer from severe pain, especially on one side of her head and face, vision, and concentration problems.  (App. 6, ¶ 15.).  Clarke-Smith promptly visited her physician multiple times for treatment.  (*Id.*).   Her physician prescribed medicine for the malady.  (*Id.*).  By mid-February 2014, the condition became so debilitating – especially due to severe head pain and blurred vision – that she was forced to leave work in the morning of February 18, 2014.  (*Id.*).  When she left work, Clarke-Smith did not take her BPIH laptop with her.  (*Id.*).

10.     Clarke-Smith's physician advised her to take a leave of absence.  (*Id.*).   On February 19, 2014, Clarke-Smith's husband visited BPIH's office and dropped off several leave of absence forms, which indicated she needed leave until March 7, 2014.  (*Id.*; App. 10-12).  Clarke-Smith's husband also obtained FMLA forms from BPIH's CFO Melanie Stark (but who did not even ask how she was doing).  (App. 7, ¶ 15.).  One of the FMLA forms was a Medical Certification form.  (*Id.*).  Clarke-Smith provided it to her physician.  (*Id.*).  BPIH's handbook contains a section on FMLA leave.  (*see* App. 41-42).   BPIH regularly permitted BPIH employees and employees of client companies to take FMLA leave if the reasons for the leave fell within the scope of the Family & Medical Leave Act.  (App. 7, ¶ 15).

11.     In accordance with her doctor's orders, Clarke-Smith remained off work due to her medical condition after February 18, 2014, during which time she was not capable of performing all her duties at BPIH.  (App. 7, ¶ 16).  She did not return to the BPIH offices and she did not receive any inquiries from BPIH about her job performance.  (*Id.*).

12.     On about March 5, 2014 – two days before Clarke-Smith's leave was set to expire – Clarke-Smith received a letter in the mail from BPIH's CEO Daniel.  (App. 7, ¶17; App. 13)  In that letter, Daniel informed Clarke-Smith that effective February 28, 2014, she was fired from

BPIH for "poor performance".  (App. 13).  Daniel's letter vaguely stated Clarke-Smith was fired because she had allegedly "failed to perform [her] job in the following areas: 401k deposits and COBRA benefits".  (*Id.*).  As she had never been counseled or warned about these issues, and because the letter contained no details, Clarke-Smith did not know what she was being accused of.  (App. 7, ¶ 17).  The letter contained no other reasons for her firing.  (App. 13).  At the end of his letter, Daniel wrote "In order to effectuate an exchange of belongings, if any, please appear at the company's offices next Friday, March 7, 2014, at 5 p.m.".  (*Id.*).  This was the sole communication Clarke-Smith ever received that ever referred to BPIH property.  (App. 7, ¶ 17). BPIH never communicated with Clarke-Smith that she return any specific property it alleged Clarke-Smith had.  (*Id.*).  Even though BPIH routinely offered severance to employees – including those fired for egregious misconduct – Clarke-Smith was not offered severance.  (*Id.*).

13.    About a week after Clarke-Smith received the discharge letter, BPIH filed a lawsuit against Clarke-Smith in state court.  (*see* App. 45-55).  In the lawsuit, BPIH sought over $1,000,000 in damages against Clarke-Smith.  (App. 46, ¶ 5).  BPIH asserted eight causes of action against her, including fiduciary duty breach, defamation, conversion, theft, and misappropriation of trade secrets.  (App. 49-54).  BPIH also plead for a TRO and temporary injunction (even though contrary to the Texas Rules of Civil Procedure, the Petition was not verified).  (App. 47-49).  According to the Petition, BPIH sought an injunction to stop Clarke-Smith "from defaming BPIH" and from "destroying, altering, or otherwise misusing [BPIH's] confidential information".  (App. 47, ¶ 13).

14.    Clarke-Smith was never served with this lawsuit, although a process server came by Clarke-Smith's home when she was not there and told her husband about the lawsuit. (App. 7, ¶ 18).  BPIH non-suited that case on April 28, 2014.  (App. 125).

15.     Clarke-Smith later filed an EEOC charge on May 9, 2014.  (*see* App. 8, ¶ 19 and App. 15).  The parties then attended a mediation on July 22, 2014.  (App. 8, ¶ 19).  The next day, BPIH refiled its state court Petition.  (*Id.*; App. 56-64).  That lawsuit also contained the same eight causes of action as the first lawsuit and continued to demand over $1,000,000 in damages.  (*Id.*).

16.     After her termination, Clarke-Smith applied for unemployment benefits.  (App. 8, ¶ 20).  Unlike its normal practice, BPIH contested the claim.  (*Id.*).  After Clarke-Smith won the benefits after a contested evidentiary hearing, BPIH appealed that decision to the TWC Commissioners, which was denied.  (*Id.*; App. 17).

## III. <u>ARGUMENT AND AUTHORITIES</u>

### A.     SUMMARY JUDGMENT STANDARDS

Summary judgment can be granted only when the pleadings, submitted discovery material, and affidavits, demonstrate there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  A reviewing court must draw all reasonable inferences in favor of the non-moving party and refrain from weighing the evidence or making credibility determinations.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000).

### B.     EVIDENCE OF RETALIATION IS OVERWHELMING

Clarke-Smith's last meeting with CEO Daniel was tense: without advance notice, he walked into her office and after stating that the individuals who ran BPIH had alerted him to the issue, demanded to know if Clarke-Smith had said she had reached a ceiling because she was African-American.  (App. 6, ¶ 14).  Clarke-Smith forthrightly admitted to making the statement and then explained to Daniel exactly why she felt that way.  (*Id.*).

Within a few weeks, Clarke-Smith was suddenly terminated without any prior warning for alleged poor performance and then sued for bogus claims for over $1,000,000. (App. 7-8, ¶¶ 17-19). Before this, Clarke-Smith had utterly no idea her job was in jeopardy. (App. 7, ¶ 17). She had never received discipline and had never been warned her performance was substandard. (*Id.*). In fact, in her 2013 written review, Daniel had among other praise, effusively extolled her "commitment, dedication, loyalty, and work ethic" that was "unmatched by anyone in the company". (App. 9).

BPIH contends its reasons for firing her and for suing her are the same. (BPIH Brief at 14, n. 7 [Doc. 48, filed 7/6/15]). However, by itself, this proves BPIH's reasons for its action are untrue. It is impossible to reconcile the termination letter and lawsuit. BPIH's termination letter solely contained vague accusations that Clarke-Smith had poorly performed concerning 401k and COBRA issues (the allegations were so vague Clarke-Smith had no idea what she was accused of). (App. 13; App. 7, ¶ 17). But about the time it fired her, BPIH sued Clarke-Smith for $1,000,000 for among other things, theft, defamation, breach of fiduciary duties, and misappropriation of trade secrets. (App. 45-55). There can be no more stark example of pretext: two nearly contemporaneous documents that are not just inconsistent, but mutually exclusive. Moreover, the lawsuit claims were wholly bogus. (*see* Clarke-Smith's Motion for Summary Judgment [Doc. 42, filed 7/6/15]).

Even now, as seen below, BPIH keeps changing its reasons for firing and suing Clarke-Smith. These ever-shifting and contradictory reasons and other salient evidence discussed below wholly undermine BPIH's stated reasons for its actions.

To make out a *prima facie* retaliation case under Title VII and § 1981, a plaintiff must establish that (1) she engaged in protected conduct; (2) BPIH took adverse action; and (3) a

causal link existed between the adverse action and protected conduct.  *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir. 2002).  Once a plaintiff establishes a *prima facie* case, the defendant must demonstrate a legitimate, non-retaliatory reason for its action.  *Gee,* 289 F.3d at 345.  The plaintiff must then show the stated reasons for the adverse action are a pretext for retaliation.  *Id.*

### 1.     Clarke-Smith Engaged in Both Oppositional and Participatory Conduct

No doubt can exist that in her last face-to-face meeting with Daniel, Clarke-Smith engaged in protected conduct.  Protected conduct includes acts of opposition.  42 U.S.C. § 2000e-3(a).  The scope of opposition is broad: it encompasses any conduct that a reasonable juror could judge to be "resistant" or "antagonistic" to perceived discrimination.  *See Crawford v. Metro. Gov. of Nashville*, 555 U.S. 271, 276 (2009).  When an employee communicates a belief to the employer that it has discriminated, that communication "virtually always constitutes the employee's **opposition** to the activity".  *Id.* citing 2 EEOC Compliance Manual §§ 8-II-B(1), (2), p. 614:0003 (March 2003) (emphasis in original).  Oppositional conduct therefore occurs whenever an employee communicates her belief that her employer has acted unlawfully.  *Lopez v. Donahoe,* 2015 WL 1311377 (S.D. Tex. March 23, 2015).

Because the key to oppositional conduct is criticism of perceived discrimination, it is not necessary for the employee to have initiated the criticism.  Rather, it is sufficient if the employee responds to questions put by the employer.  *Crawford,* 555 U.S. at 277.

Here, in her last meeting with CEO Daniel, Clarke-Smith explained why she believed that BPIH was discriminating against her due to her race.  (App. 6, ¶ 14).  These comments fall

squarely within the scope of oppositional conduct as set forth above.[1]  Moreover, BPIH's second lawsuit against Clarke-Smith was filed not long after she had filed her EEOC charge.  It is undisputed that filing an EEOC charge constitutes protected conduct.  *See* 42 U.S.C. § 2000e-3(a)(i).

### 2.      Clarke-Smith Suffered Multiple Adverse Actions

Clarke-Smith was both terminated and was sued twice for over $1,000,000.  These are patently adverse actions.[2]

### 3.      A Causal Connection Exists Between Clarke-Smith's Protected Conduct and The Adverse Actions

A causal connection between protected conduct and adverse action can be established by varied evidence including the temporal proximity between the two, the plaintiff's disciplinary record before the protected conduct, and whether the employer followed its policies and procedures in taking the adverse action.  *See Nowlin v. Resolution Trust Corp.,* 33 F.3d 498, 508 (5th Cir. 1994); *see also Smith v. Xerox Corp.*, 371 Fed. Appx. 514, 520 (5th Cir. 2010).

BPIH does not challenge these elements and for good reason.  Only a matter of weeks elapsed between Clarke-Smith's oppositional conduct on the one hand and, on the other hand, her termination.  (App. 6-7, ¶¶ 14-17).  Prior to these events, Clarke-Smith's disciplinary record was clean.  (*Id.*).  In fact, CEO Daniel had praised Clarke-Smith for exhibiting the most commitment, dedication, loyalty, and work ethic of any employee.  (App. 9).  Contrary to its

---

[1]      BPIH mentions Clarke-Smith's deposition testimony that in the meeting with Daniel she did not initiate a complaint.  (BPIH Brief at p. 22-24).  However, consistent with the standards set forth above, oppositional conduct does not require that an employee make a formal complaint.  *See Benussi v. UBS Fin. Serv., Inc.* 2014 WL 558984 (S.D. N.Y. Feb. 13, 2014).  Moreover, in her deposition, Clarke-Smith clarified that she told Daniel in that meeting why she felt as she did which "would have been taken as a complaint".  (App. 100, lines 4-9).

[2]      To the extent BPIH contends that filing a lawsuit against an ex-employee is not an adverse action, that contention is plainly unavailing under *Burlington Northern & Santa Fe RR. Co. v. White*, 548 U.S. 53 (2006) and *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997).  In *White*, the Supreme Court described the broad scope of Title VII's anti-retaliation standard and held that it covers any adverse action which might dissuade a reasonable employee from making a charge of discrimination.  548 U.S. at 68.  In *Robinson*, the Court made clear an employer may be liable for retaliating against a former employee.  *Robinson*, 519 U.S. at 341.

normal practice, BPIH also never even questioned Clarke-Smith about the issues it allegedly fired her for – even though she was soon to return from leave. (App. 7, ¶¶16-17). Even more importantly, BPIH sued Clarke-Smith for $1,000,000 based upon trumped up, bogus claims. These undisputed facts establish a close causal connection between Clarke-Smith's oppositional conduct and the adverse actions BPIH took against her. Similarly, her clean disciplinary record and the close temporal proximity between the filing of her EEOC charge and the second lawsuit establishes a causal connection between these two events.

### 4.      Evidence of Pretext Is Overwhelming

BPIH contends it fired and sued Clarke-Smith for the same reasons. (BPIH Brief at 14, n. 7). Yet the termination letter and lawsuits cannot be reconciled. The termination letter merely refers (in vague terms) to Clarke-Smith's alleged poor performance concerning 401k and COBRA issues. (App. 13). In stark contrast, the lawsuits allege a litany of disloyal conduct and intentional torts, including theft, defamation, breach of fiduciary duties, and misappropriation of trade secrets. (App. 45-455 and App. 56-64). By themselves, the dramatic conflict between the termination letter and the lawsuits prove pretext as to both Clarke-Smith's termination and the lawsuits.[3]

Moreover, even now BPIH cannot get its story straight. As noted, the termination letter solely cited alleged problems in completing 401k and COBRA functions. (App. 13). But in his affidavit, Daniel now claims he also fired Clarke-Smith because she allegedly lied to a federal agent. (BPIH App. at 47 [Doc. 49, filed 7/6/15]) (although nowhere does BPIH's evidence substantiate or explain this wildly conclusory statement). Because this very serious (albeit

---

[3]      BPIH contends Clarke-Smith did not exhaust her administrative remedies as to the lawsuit claim. (BPIH Brief at 12). However, BPIH ignores that Clarke-Smith is also suing under § 1981, which does not require exhaustion of administrative remedies. *See Jones v. Robinson Prop. Group, L.P.,* 427 F.3d 987, 991 (5th Cir. 2005). Consequently BPIH's contentions about failure to exhaust as to Clarke-Smith's non-termination § 1981 claims do not have merit.

unsupported) allegation was not even mentioned in the termination letter, it is inescapable it was not a reason for discharge.

In its Brief, BPIH also adds yet two more reasons for Clarke-Smith's termination: alleged payroll and tax errors.  (BPIH App. at 16).  Yet these purported reasons were not mentioned in Daniel's recent affidavit (BPIH App. at 47) or the termination letter.  (Letter).  In sum, this is a dramatic case of an employer producing not only ever-shifting, but remarkably inconsistent and even mutually exclusive reasons for discharge.  The reasons are patently pretextual.[4]

Further still, BPIH's evidence of its alleged reasons is almost all based upon conclusory or vague allegations.  BPIH has submitted two affidavits of Daniel.  (BPIH App. at 1-51).  These affidavits are replete with conclusory or vague statements that do not constitute admissible evidence.  *See Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).  That BPIH would rely upon such hazy and conclusory evidence is further evidence of pretext.

Pretext means that a stated reason for an adverse action is "unworthy of credence"; that is, it is not the real reason for the action.  *See Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2003).  Inconsistent and shifting reasons for an adverse action constitute powerful evidence of pretext.  *See Gee*, 289 F.3d at 347-8.  This type of evidence gains even more in importance where the plaintiff's evidence establishing a *prima facie* case is strong.  *See Laxton*, 333 F.3d at 580.  An employer's failure to follow its normal disciplinary procedures – particularly when combined with a plaintiff's clean disciplinary record before the adverse action – also is evidence of pretext.  *See West v. Nabors Drilling Co.,* 330 F.3d 379, 388 (5th Cir. 2003).  For example,

---

[4]        BPIH makes much of the fact that in deposition, Clarke-Smith admitted making some errors at work. (BPIH Brief at 16-18).  But in that testimony, Clarke-Smith solely admitted she **may have** made an error with respect to a payroll for a client company, her staff **may have** failed to timely send a payroll expense report to BPIH, and **may have** not timely sent one 401k contribution to one employee's account.  (*Id.*).  These limited admissions that Clarke-Smith may have made isolated errors (just as all employees do) in no fashion supports BPIH's claim that no fact issue on pretext exists.  Moreover, Clarke-Smith has averred she did not make any errors as to COBRA issues and that she did not steal a laptop or any confidential information, did not ever act disloyally to BPIH, did not defame BPIH, and did not otherwise commit any intentional torts against BPIH.  (App. 8, ¶ 21).

12

where an employer claims it discharged an employee for poor performance, failing to counsel the employee and to allow her to give her side of the story is indicative of pretext. *See Laxton,* 333 F.3d at 580.

As seen above, BPIH's reasons for firing and suing Clarke-Smith are both dramatically conflicting and ever changing. When coupled with the evidence supporting Clarke-Smith's *prima facie* case, this compelling evidence of pretext is strengthened even more. As noted in Section III.B.3., that evidence included that (1) Clarke-Smith was fired and sued within a few weeks of engaging in protected conduct (2) before this, Clarke-Smith had an exemplary work record and had never been disciplined or counseled; and (3) contrary to its practices, BPIH did not provide her a warning nor even question her about her performance.

Potent evidence that BPIH's reasons for its actions are unworthy of credence, together with the compelling evidence supporting her *prima facie* case precludes summary judgment. *See Reeves,* 530 U.S. at 147-9; *Laxton*, 333 F.3d at 578.[5]

## C.   THE OVERWHELMING EVIDENCE OF PRETEXT DESCRIBED ABOVE ALSO BARS SUMMARY JUDGMENT ON CLARKE-SMITH'S CLAIM SHE WAS FIRED BECAUSE OF HER RACE

Clarke-Smith alleges that she was fired due to her race. (Plf's Complaint at ¶ 23 [Doc. 1, filed 7/30/14]). In its Motion, BPIH does not contest that Clarke-Smith can establish a *prima facie* case of race discrimination. (BPIH Brief at 15). Rather, it solely contends insufficient evidence of pretext exists. (*Id.*).

This contention ignores the overpowering evidence of pretext detailed above in Section III.B.4. That evidence at the least creates a fact issue as to whether BPIH's reasons for firing her

---

[5]   Besides her termination and the lawsuits filed against her, Clarke-Smith also has plead that BPIH retaliated against her by challenging her claim for unemployment benefits and for refusing to pay her a severance. (Plf's Complaint at ¶ 23). These both fit within the scope of an adverse action for retaliation. *See White,* 548 U.S. at 68. Because all of BPIH's reasons for taking action against Clarke-Smith are pretextual, these claims survive summary judgment as well.

are "unworthy of credence". Consequently, BPIH's request for summary judgment as to Clarke-Smith's discrimination claim must be rejected.

Moreover, contrary to BPIH's contention, it is highly relevant that Hillman – one of the individuals who controlled BPIH – routinely made racial remarks. (App. 5-6, ¶¶ 12-13). Clarke-Smith does not necessarily point to the remarks as direct evidence of discrimination. However, they nonetheless furnish circumstantial evidence of discrimination. In this context, the stray remark doctrine does not apply. Rather, the remarks are relevant as circumstantial evidence if they: (1) reveal discriminatory animus; and (2) if the person who made the comments was a person with influence or leverage over the decision-maker. *See Laxton,* 333 F.3d at 583 citing *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir. 2000). That test is met here. First, for a principal such as Hillman to habitually distinguish employees on the basis of race is discriminatory. Second, Hillman was a key decision-maker who could and did direct Daniel whom to hire and fire. (App. 6, ¶ 13). Consequently, these remarks furnish admissible evidence supporting a finding of discrimination.

Moreover, it is also relevant how the Champion CEO's vile racial discrimination was handled. That CEO was a friend of Hillman's. (App. 5-6, ¶¶ 12-13). After an employee blew the whistle to report that the CEO routinely uttered despicable racial and homophobic slurs and directed that his company not employ African-Americans, the CEO was **not** terminated. Rather, he was allowed to resign and his employer agreed in a severance agreement not to pursue charges against him. (*see* App. 21-27). Meanwhile, Clarke-Smith was fired without warning for supposed performance issues and then sued for $1,000,000. This difference in treatment is highly suggestive of racial discrimination.

14

Also relevant is that BPIH and its clients routinely did not challenge unemployment claims of white managers, even ones who had engaged in serious misconduct. (App. 4-5, ¶ 10). Those same managers were also offered severance payments. (App. 5, ¶11). This again contrasts with BPIH's venomous approach to Clarke-Smith. Further evidence of discrimination can be seen when Clarke-Smith was directed to hire a subordinate – who was white – at a salary substantially higher than that earned by Clarke-Smith. (App. 5-6, ¶ 13). The directive to do so came from Daniel and Narosov. (*Id.*).

For all the above reasons, summary judgment is not warranted on Clarke-Smith's discriminatory termination claim.

## D.   BPIH IS NOT ENTITLED TO SUMMARY JUDGMENT ON CLARKE-SMITH'S FMLA CLAIMS

It is undisputed that BPIH terminated Clarke-Smith while she was on FMLA-qualifying leave. (App. 7, ¶ 17). However, BPIH contends it was not a FMLA covered employer and that Clarke-Smith was fired for legitimate reasons. (BPIH Brief at 25-28). Neither contention is valid.

### 1.   As An Integrated Or Joint Employer, BPIH Was An FMLA Covered Employer

BPIH did not have an arms-length relationship with its client companies. Rather, it was deeply integrated with those client companies. In essence, as seen below, it functioned as the control center for its client companies.

The FMLA regulations contemplate at least two methods of determining that two entities should be combined for purposes of counting employees.[6] First, the regulations provide that two or more separate entities may be considered integrated employers. *See* 29 C.F.R. §

---

[6]   To be a covered FMLA employer, BPIH had to employ 50 or more employees each day during 20 or more work weeks in 2013 and 2014. *See* 29 C.F.R. § 825.104 (2015). BPIH claims it had 50 employees in 2014 for only 12 weeks. (BPIH Brief at p. 25).

825.104(c)(2).  Second, multiple entities can be joint employers.  *See* 29 C.F.R. § 825.106.  Both

apply here.

<strong>(a)      BPIH Is An Integrated Employer With Its Clients</strong>

Under the FMLA regulations, multiple entities will be deemed a single employer

depending upon various factors which can include whether:

- The entities have common management;
- There exists interrelation of operations;
- There exists centralized control of labor relations; and
- The degree of common ownership/financial control.

29 C.F.R. § 825.104(c)(2).  "No single factor among the four is determinative, and all four need

not be present in every case to conclude that two entities are integrated".  *Demyanovich v. Cadon

Plating & Coatings, LLC,* 747 F.3d 419, 428 (6th Cir. 2014).

Even though Clarke-Smith plead this theory (Compl. at ¶ 29), BPIH has neither

addressed it nor furnished any material evidence on it.  Clarke-Smith has furnished substantial

evidence as noted below.

First, BPIH and its clients shared numerous managers and directors.  BPIH's Board of

Managers included Semyon Narosov and Mike Austin, who was Chairman of the Board.  (*see*

App. 65-67; App. 106).  Daniel was its CEO and Chris Simdon was its COO.  (App. 2, ¶ 5).

While serving as Chair of BPIH's Board, Austin also had formal management roles with several

BPIH clients including Total Surgical Management and L2 Surgical (App. 97; App. 84-88).  He

was also part owner of BPIH and several BPIH clients including Medicus Labs, United

Toxicology, Infinity Toxicology, Horizon Testing, and Sunrise Toxicology.  (App. 109; App.

122).

While serving on BPIH's Board, Narosov had formal management roles with Executive

Healthcare and Forge Realty, both BPIH clients.  (App. 69).  Hillman, who along with Narosov

16

and Austin was intimately involved in many critical decisions involving BPIH and its clients (App. 3, ¶ 5), also held a director position with BPIH clients U.S. Health Group and Forge Realty.  (App. 76).

While CEO and part owner of BPIH, Daniel also was on the payroll of BPIH client United Toxicology (App. 2, ¶5) while also having management roles with numerous BPIH clients including United Toxicology (President), Medicus Labs (CEO), Infinity Toxicology (Manager), Sunshine Toxicology (Manager), Healthwest (Manager), and Horizon (Manager). (App. 107-108).   Daniel also owned part of BPIH clients America Laboratory Group and Horizon.  (App. 121-122; App; 78-83).   BPIH COO Simdon also had a management role at BPIH clients Roc Pharma and Lot Pharma and was simultaneously on the payroll of Apex Pharma.  (App. 2-3, ¶ 5).  BPIH itself was also a listed Manager of several of its clients including University Labs, Hygeia Affiliates, Sunrise Toxicology, and America Laboratory Group, and had an ownership interest in United Toxicology and Medicus Laboratories.  (App. 120).  BPIH's VP of Lab Operations was on BPIH's payroll but had authority over multiple BPIH clients who operated laboratories.  (App. 2-3, ¶ 5).  Beyond the formal ties between managers, in practice Hillman, Austin, Narosov, and Daniel were routinely involved in management decisions related to both BPIH and its clients.  (*Id.*).   These intricate cross-management ties exemplifies how interrelated the management structure is between BPIH and many of its clients.

Similarly, numerous facts demonstrate a profound integration of operations among BPIH and its clients:

- BPIH and many of its clients – including U.S. Toxicology, U.S. Health Group, Total Surgical, Apothecary Pharmacy, Medicus Loaboratory, L2 Surgical, Infinity Toxicology, United Toxicology, and 1st Health – shared the same office building (App. 3-4, ¶ 7);

- For most clients, BPIH performed all accounting, patient billing, IT system operations, payroll, insurance, benefits, financial reporting and forecasting services (App. 2, ¶ 4);

- BPIH performed all human resources services for clients including the maintenance of personnel files, and the creation of handbooks, policies, and forms (*Id.*); and

- Employees often transferred from BPIH to clients or visa versa and several received pay from BPIH and client companies simultaneously (App. 3, ¶ 6).

BPIH and its clients were also subject to centralized control of labor relations. First, all human resources policies emanated from BPIH. (App. 2, ¶ 4). Clarke-Smith routinely weighed in on human resources issues for substantially all of BPIH's clients. (*Id.*). More importantly, Daniel routinely decided disciplinary and discharge issues for employees of BPIH and its clients. (*Id.*). For example, in 2013, Daniel decided to discharge a manager for BPIH client United Toxicology and to discipline a more senior manager of that client for misconduct. (*see* App. 19-20). Consequently, no doubt can exist that BPIH and its clients shared a centralized labor relations function.

As to the last factor of the integration test, as noted above, BPIH had ownership interests in several clients as did Daniel and Austin. Directly or indirectly, Hillman, Narosov, and Austin had financial interests in BPIH and many of its clients. (App. 3, ¶ 5).

These facts point to extensive integration of BPIH and its clients. With much less relevant evidence, courts have determined entities met the integrated employer test. *See, e.g., Demyanovich,* 747 F.3d at 428 (two entities shared several managers, relied upon a central source for human resources matters, shared the same address, did extensive business with one another, and shared the same group of investors and so were integrated employers under the FMLA); *Schubert v. Bethesda Health Group, Inc.*, 319 F. Supp. 2d 963, 968-69 (E.D. Mo. 2004) (two health entities were integrated under the FMLA where they shared the same officers and directors, shared the same address, employees could transfer from one entity to the other, one

handled payroll for both, and one exercised "some" control over the others' labor relations); *see also Dooling v. Bank of the West*, 2013 WL 3776741 (E.D. Tex. July 17, 2013).

Because this case exemplifies a clear case of an integrated employer, the number of employees employed by BPIH and its clients can be aggregated for purposes of counting the 50 employee FMLA employer coverage threshold. 29 C.F.R. § 825.104(c)(2). Doing so here yields well over 50 total employees (App. 3-4, ¶ 7) such that BPIH is an FMLA covered employer.

## 2. Alternatively, BPIH Is A Joint Employer With Its Clients

Even if BPIH and its clients were not an integrated employer, BPIH was a joint employer with those clients. FMLA regulations contemplate two or more entities may be joint employers such as in the following circumstance: "Where the employee performs work which simultaneously benefits two or more employers … a joint employment relationship will be considered to exist in situations" such as:

> (i)     Where there is an arrangement between employers to share an employee's services or to interchange employees;
>
> (ii)    Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee;
>
> …

29 C.F.R. § 825.106(a).

Under this regulation, where two or more entities share an employee's services, the two employers are joint employers. *See Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 608 (7th Cir. 2014). In *Cuff*, the court affirmed summary judgment for the plaintiff on this issue because the evidence was undisputed that the plaintiff worked with both entities each day and represented them both. *Id.* These facts squarely fell within the regulatory language of "an arrangement between employers to share an employee's services" where an employer "acts directly or

indirectly in the interest of the other employer in relation to the employee".  *Id.*  citing 29 C.F.R. § 825.106(a).  This fact pattern mirrors the one here.

BPIH does not address this concept.  Rather, it solely contends that it is a Professional Employer Organization ("PEO") and therefore falls within an exception to joint employment. This contention is without merit.  The FMLA regulations provide that a PEO does not become a joint employer with its client "when it merely performs … administrative functions [such as payroll, benefits, regulatory paperwork, and updating employment policies]".  *See id.*  However, the regulation makes clear that a PEO can be a joint employer depending upon "the economic realities", including where it exercises the right to hire and fire.  *Id.*

Here, BPIH is not a mere PEO, as seen above in Section III.D.1.(a).  BPIH is not unaffiliated with its clients.  (*Id.*).  Nor does it merely perform administrative functions.  (*Id.*). Rather, it was intimately connected with its clients and routinely participated in employment decisions including discipline and firings.  (*see id.*).  Even if it is a PEO, the economic realities as noted above establish that BPIH should be considered a joint employer with its clients.

More fundamentally, BPIH's PEO argument ignores the joint employment regulation's bigger picture, which is that multiple entities will be joint employers "where there is an arrangement between employers to share an employee's services …" or "where one employer acts … in the interest of the other employer in relation to the employee".  29 C.F.R. § 825.106(a).  As in *Cuff*, *supra.*, the undisputed facts here demonstrate that BPIH and its clients are joint employers.  Accordingly, the number of employees is well more than 50 such that BPIH is a covered employer.

3.      **BPIH Violated The FMLA By Terminating Clarke-Smith During An FMLA Leave**

(a)      **BPIH Interfered With Clarke-Smith's FMLA Rights**

Clarke-Smith has plead that BPIH interfered in her FMLA rights by terminating her during her FMLA leave.  (Complaint at ¶ 30).  Under the FMLA, Clarke-Smith was entitled to 12 weeks of FMLA leave.  29 U.S.C. § 2612(a)(1).  It is undisputed Clarke-Smith was fired two weeks into a leave due to her serious health condition.  (App. 6-7, ¶¶ 15-17).

In its Motion, BPIH does not contest that Clarke-Smith was on a FMLA qualifying leave. Rather, it solely contends that it had a right to fire her for alleged performance problems.  (BPIH Brief at pp. 26-7).  However, the FMLA regulations make clear that this is an affirmative defense.  29 C.F.R. § 825.216(a)(1).  BPIH's intent is irrelevant in an interference claim.  *See Nero v. Indus. Molding Corp.,* 167 F.3d 921, 927 (5th Cir. 1999); *see also Cuellar v. Keppel Amfels, LLC.,* 731 F.3d 342, 348-50 (5th Cir. 2013). (Elrod. J, concurring).  Because intent is irrelevant, the *McDonnel-Douglas* test does not apply.  *Id.*; *see also Strickland v. Water Works & Sewer Bd. Of City of Birmingham,* 239 F.3d 1199, 1208 (11th Cir. 2001) (the employer had the burden to prove "without dispute" that it discharged the plaintiff for a reason wholly unrelated to FMLA leave, which it was unable to do, thus creating a triable issue).

The Fifth Circuit's *Nero* decision exemplifies these principles.   In that FMLA interference case, the employer claimed it fired the plaintiff for performance reasons.  167 F.3d at 926.  But the evidence indicated that prior to discharge, the plaintiff had received very good evaluations and had received no warnings.  *Id.*  Along with the timing of his discharge, this evidence was sufficient to establish a fact question (which a jury resolved in favor of the plaintiff).  *Id.*

21

Here, BPIH cannot remotely prove beyond dispute that it terminated Clarke-Smith for reasons unrelated to her FMLA leave.  Because of the timing of Clarke-Smith's firing and because BPIH's proof of an independent reason for firing her are contradictory and full of holes, summary judgment is not warranted on Clarke-Smith's interference claim.

**(b)      Alternatively, BPIH Retaliated Against Clarke-Smith For Taking FMLA Leave**

Even though BPIH has not addressed it, Clarke-Smith has also alleged that BPIH retaliated against her for taking FMLA leave by firing and suing her.  (Complaint at ¶ 30).  The same reasons as described in Section III.B.4. above also supports the denial of summary judgment on the FMLA retaliation claim.  It is also highly relevant that Clarke-Smith was suddenly fired just two weeks after beginning her FMLA-qualifying leave.

Another reason independently requires denial of summary judgment on this claim.  In a FMLA retaliation case, a mixed motive analysis also can apply.  *See Ion v. Chevron USA, Inc.*, 731 F.3d 379 (5th Cir. 2013).  Under the mixed motive test, a plaintiff need only present evidence that the employer's stated reason for discharge, while true, was but one of the reasons, another of which was discrimination.  *Id.* at 390.  If the plaintiff does so, to escape summary judgment, the employer must establish as a matter of law it would have taken the adverse action despite its retaliatory motive.  *Id.*  The employer's burden is essentially an affirmative defense.  *Id.*

Here, as noted above, BPIH's stated reasons for discharging Clarke-Smith are not remotely the real reason for her sudden firing.  But even if assuming for sake of argument they were, evidence exists that Clarke-Smith's FMLA leave was a reason for her firing.  Clarke-Smith's husband picked up FMLA paperwork from BPIH on February 19, 2014, including a Medical Certification form.  (App. 6-7, ¶ 15).  By regulation, that form was due 15 days thereafter.  29 C.F.R. § 825.305(b).  Consequently, the due date for the form was March 6, 2014.

BPIH fired Clarke-Smith just days before the due date.   Moreover, when Clarke-Smith's husband picked up the FMLA forms at BPIH on February 19, 2014, BPIH's CFO handed them to him without even asking how Clarke-Smith was doing.  (App. 7, ¶ 15).

This is more than sufficient evidence to require BPIH to prove its affirmative defense.  It cannot do so.  As seen above in this Response, BPIH's reasons for firing Clarke-Smith do not remotely add up.  Consequently, summary judgment should be denied for this separate reason.

## IV. <u>CONCLUSION</u>

WHEREFORE, Clarke-Smith respectfully requests that Counter-Defendant's Motion for Summary Judgment be denied in its entirety.   Clarke-Smith also requests any other relief to which she may be entitled.

Respectfully submitted,

*/s/ Chris E. Howe*
Chris E. Howe
State Bar No. 10089400
Chris.howe@kellyhart.com
Ezra R. Kuenzi
State Bar No. 24078808
Ezra.kuenzi@kellyhart.com
**KELLY, HART & HALLMAN, P.C.**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 332-2500
(817) 878-9280 (fax)

**ATTORNEYS FOR
PLAINTIFF/COUNTER-DEFENDANT
NICOLE CLARKE-SMITH**

## <u>CERTIFICATE OF SERVICE</u>

On July 27, 2015, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

/s/ *Chris E. Howe*
Chris E. Howe

24